**Duane K. Thompson***
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, DC 20549**
**(202) 551-7159 (Thompson)**
***Pro Hac Vice Application Pending**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | 1:23-cv-3309 ( ) |
| -against- | |
| **LEE COHEN,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Lee Cohen ("Cohen" or "Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      From at least July 2017 through at least November 2017 (the "Relevant Period"), Cohen violated the anti-fraud provisions of the federal securities laws through his participation in a fraudulent scheme to manipulate trading in the stock of HD View 360 Inc. ("HD View"), a now-defunct microcap company[1] that was based in Miami, Florida.

---

[1] Microcap companies are characterized by thin capitalization, low share prices, limited public information and little or no analyst coverage.

2.    The fraudulent scheme in which Cohen participated was conceived by two individuals, HD View's CEO and majority shareholder Dennis Mancino ("Mancino") and his co-conspirator William Hirschy ("Hirschy"), both of whom the Commission and criminal authorities have already charged in parallel actions.[2]  Beginning in 2017, Mancino and Hirschy orchestrated a fraudulent scheme (the "Matched Trading Scheme" or the "Scheme")[3] manipulating the price of HD View stock from zero to over $5 per share.  The purpose of the Matched Trading Scheme was to allow Mancino and Hirschy to sell their shares of HD View stock into an artificially inflated market.

3.    Cohen joined the Matched Trading Scheme in approximately July 2017.  In furtherance of the scheme, Cohen duped investors into placing buy orders at artificially high prices that closely matched the target prices sought by Mancino and Hirschy.  The orders were then routed to matching sell orders placed by brokerage accounts that Mancino or Hirschy controlled.  Hirschy or intermediaries acting at Hirschy's direction then compensated Cohen by arranging for him to receive commissions based on a percentage of the sales he generated.

4.    During the Relevant Period, Cohen operated a call room located in the Philippines to generate buy orders for HD View stock from unsuspecting investors in this District and around the United States.  Cohen targeted senior citizens and other potential investors he believed were susceptible to cold call solicitations, dangling the prospect of a quick profit.  Cohen also falsely represented himself as a legitimate stock promoter, and deliberately misled potential investors about HD View and his incentive to recommend the stock.

---

[2] *SEC v. Mancino*, *et al.* 2:18 Civ. 01316-GRB-SIL (E.D.N.Y. Mar. 2, 2018); *United States v. Dennis Mancino and William Hirschy,* 1:18-cr-00296 (E.D.N.Y. June 13, 2018).

[3] A "matched trade" is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security.

5.      For example, Cohen's sales pitch to investors was that HD View had excellent growth prospects, that there was an active and rapidly rising market for its stock, and that investors needed to act quickly in order to profit from expected further price increases.  In reality, HD View was a failing start-up company that reported a loss of approximately $360,000 in September 2017.  It was later dissolved and its stock delisted by the Commission for failure to file any financial statements after September 2017.

6.      Cohen also falsely told investors that he had negotiated to receive stock warrants from HD View, thus conveying the false impression that he personally wanted to acquire the stock because it was a good investment, and seeking to bolster the credibility of his sales pitch.  In fact, Cohen was not entitled to receive warrants to purchase HD View stock, nor did he have any other stake in the company's success as a business.  To the contrary, Cohen's sole incentive to generate sales of HD View stock was his agreement with Hirschy and other participants in the Matched Trading Scheme to give Cohen a share of the sales proceeds he generated.

7.      As soon as Cohen had convinced an investor to make an offer to buy a particular amount of HD View stock at a particular price or within a particular price range, Cohen immediately informed Hirschy, so that Hirschy could quickly arrange a matched sale to that investor from one or more brokerage accounts that Hirschy or Mancino controlled.  As a result of his misconduct, numerous investors purchased HD View stock at artificially high prices, and Cohen received at least approximately $46,500 in undisclosed sales commissions directly from Hirschy or indirectly through intermediaries.

8.      In addition to violating the anti-fraud provisions of the federal securities laws, Cohen also violated securities law provisions that require brokers and dealers to register with the Commission.  During the Relevant Period, Cohen was not registered with the Commission as a broker.

Yet Cohen acted as a broker in arranging sales of HD View stock in exchange for commissions from Hirschy or designated intermediaries.  Cohen participated at key points in the chain of distribution of HD View stock to investors, including actively soliciting purchases from investors, and earned transaction-based compensation from his efforts.

9.      In March 2022, Cohen was arrested and criminally charged with conspiracy to commit securities fraud for his role in the Matched Trading Scheme.  *See United States v. Cohen,* 1:22-cr-00209-KAM (E.D.N.Y. May 4, 2022).  He has pleaded guilty, and is in custody awaiting sentencing.

## VIOLATIONS ALLEGED AND RELIEF SOUGHT

10.      Defendant, on account of his conduct as alleged herein, has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)]; Sections 9(a)(1) , 9(a)(2), 10(b), and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(1), 78i(a)(2), 78j(b), and 78o(a)(1)]; and Rule 10b-5 of the Exchange Act [17 C.F.R. § 240.10b-5].  The Commission seeks a final judgment permanently enjoining Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint.  The Commission also seeks a final judgment ordering Defendant to disgorge his ill-gotten gains pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3) (d)(5) and (d)(7)], together with prejudgment interest thereon; and prohibiting Defendant from future participation in an offering of penny stock pursuant to Section 20(f) of the Securities Act [15 U.S.C. §77t(f)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

4

**JURISDICTION AND VENUE**

11.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

12.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Among other things, Cohen used interstate communications facilities to solicit investors located in the United States to make offers to purchase HD View stock.  Defendant also used interstate communications facilities to coordinate matched trading with Mancino and Hirschy.

13.    Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts or transactions constituting the violations alleged herein occurred within the Eastern District of New York.  Defendant solicited investors located in this District to make offers to purchase HD View stock. Investors located in the District purchased HD View stock as result of Defendant's solicitations.

**DEFENDANT**

14.    **Lee Cohen**, age 52, is a citizen of the United Kingdom.  Cohen resided in the Philippines during the Relevant Period.  In March 2022, the United States Attorney's Office for the Eastern District of New York caused Cohen to be arrested in Saipan on wire fraud and securities fraud charges arising from his role in the HD View stock manipulation scheme and other, unrelated conduct.

Cohen has pleaded guilty, and is currently in custody in this District awaiting sentencing. *See United States v. Cohen,* 1:22-cr-00209-KAM (E.D.N.Y. May 4, 2022).

### OTHER RELEVANT PERSONS AND ENTITIES

15.     **HD View 360 Inc. ("HD View")** was a Florida corporation with its principal place of business in Miami, Florida.  HD View purported to be engaged in the business of designing and installing closed-circuit television systems and distributing network video recorders, HD cameras, and accessories.  On December 31, 2015, Mancino filed a registration statement on Form S-1 to publicly offer HD Views shares,[4] which the Commission declared effective on February 12, 2016. During the Relevant Period, HD View's shares were quoted and traded in the marketplace for over-the-counter securities known as "OTCQB" operated by OTC Markets Group[5] under the symbol "HDVW."  HD View was a "penny stock," as defined by Rule 3a51-1 of the Exchange Act [17 C.F.R. § 240.3a51-1] because, among other things, it was issued for less than $5 per share, traded below $5 per share during the Relevant Period, and was not eligible for any other exceptions in Rule 3a51-1. In addition, HD View had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1).

16.     **Dennis J. Mancino** is a United States citizen who resided in Miami, Florida during the Relevant Period.  During the Relevant Period, Mancino was the President, Chief Executive Officer, and Director of HD View.  Mancino, together with William Hirschy, orchestrated the

---

[4] A "Form S-1" is the registration statement under the Securities Act of 1933 that domestic issuers file with the Securities and Exchange Commission in order to publicly offer new securities.

[5] OTC Markets Group Inc. owns OTC Link LLC ("OTC Link"), which is an electronic inter-dealer quotation system that displays quotes in three tiers from broker-dealers for over-the-counter ("OTC") securities.  The "OTCQB" is the middle tier marketplace for the trading of OTC securities and consists mainly of early-stage and developing companies.

Matched Trading Scheme.  Mancino also controlled two other entities used to execute the Matched Trading Scheme, TJM Investments Inc. ("TJM") and DJK Investments 10 Inc. ("DJK").  Mancino pled guilty to wire fraud charges filed in this District, and served a prison term, based on his participation in the scheme to manipulate HD View stock trading and other fraudulent conduct. *United States v. Dennis Mancino and William Hirschy,* 1:18-cr-00296 (E.D.N.Y. June 13, 2018). Mancino is also a defendant in a pending SEC enforcement action in this District alleging violations of the anti-fraud provisions of the federal securities laws arising, in part, from Mancino's participation in the HD View stock manipulation scheme.  *SEC v. Mancino*, *et al.* 2:18 Civ. 01316-GRB-SIL (E.D.N.Y. Mar. 2, 2018).

17.    **William T. Hirschy** resides in Ocala, Florida.  Hirschy was the Chief Executive Officer of WT Consulting Group, LLC. ("WTC").  During the Relevant Period, Hirschy orchestrated the Matched Trading Scheme by, among other things, arranging matched trades through brokerage accounts he controlled in the name of WTC or brokerage accounts that Mancino controlled in the name of TJM or DJK.  Hirschy has pled guilty to wire fraud charges filed in this District based, in part, on his participation in the scheme to manipulate HD View stock trading.  *United States v. Dennis Mancino and William Hirschy,* 1:18-cr-00296 (E.D.N.Y. June 13, 2018).  Hirschy is awaiting sentencing.  Hirschy is also a defendant in a pending SEC enforcement action in this District alleging violations of the anti-fraud provisions of the federal securities laws arising, in part, from Hirschy's participation in the HD View stock manipulation scheme.  *SEC v. Mancino*, *et al.* 2:18 Civ. 01316-GRB-SIL (E.D.N.Y. Mar. 2, 2018).  Hirschy has admitted liability in the SEC enforcement action.

## FACTS

**A.    The Matched Trading Scheme Prior to Cohen's Involvement**

18.    Mancino and Hirschy commenced the Matched Trading Scheme in early 2017. Mancino and Hirschy manipulated the market for HD View shares, using brokerage accounts that they owned, controlled, or were associated with, to create a false or misleading impression with respect to the price and liquidity of HD View stock. Mancino and Hirschy first received assistance with their stock manipulation scheme from two individuals who resided in Canada, "Individual C" and "Individual D."

**B.    Cohen Joins the Scheme as a Call Room Operator in or about July 2017**

19.    Individual C and Individual D knew of Cohen and recommended him to Hirschy as a call room operator who might assist in the Matched Trading Scheme. Thus, in or about July 2017, Individual C and Individual D introduced Cohen to Hirschy via WhatsApp, a popular messaging service.

20.    Cohen, Hirschy, Individual C, and Individual D subsequently made an agreement amongst themselves in furtherance of the Matched Trading Scheme. Under the agreement, Individual C and Individual D would provide "lead lists" of potential investors to Cohen. The prospective investors were mostly senior citizens. In turn, Cohen would solicit the potential investors to purchase HD View stock. Hirschy would provide Cohen with the desired prices and volumes to pitch to prospective investors. Cohen knew that the prices that Hirschy provided were artificially high and did not represent the actual value of the HD Value stock. Whenever Cohen believed he had convinced a prospective investor to submit a buy order, Cohen would report to Hirschy so that he could arrange an offer to sell at a matched price.

21.    Cohen, Hirschy, Individual C, and Individual D agreed on a convention to keep track of buy orders that Cohen had generated and that resulted in executed sales of HD View stock. Cohen, Hirschy, Individual C, and Individual D also agreed that Hirschy would send Individual C 40% - 45% of the total sales revenue that Cohen generated. Cohen, in turn, would receive a 15% share of the total sales he had generated, to be paid directly to him by Individual C, who was responsible for the actual transmission of Cohen's share of the fraud proceeds to him.

22.    Mancino and Hirschy continued to orchestrate and control the Matched Trading Scheme after Cohen became an active participant. Hirschy instructed Cohen as to the desired price or price range for buy orders from investors Cohen was soliciting from his call room. Mancino or Hirschy arranged matched trades through brokerage accounts Hirschy controlled in the name of WTC or brokerage accounts that Mancino controlled in the name of TJM or DJK.

23.    Beginning no later than August 2017, Cohen and Hirschy communicated numerous times to coordinate buy orders and sell orders in furtherance of the Matched Trading Scheme. Cohen usually used Signal, a private text messaging application, and his texts usually consisted of just a figure for the price and a figure for the number of shares he had convinced an investor to submit in their buy order. Cohen also sometimes used the WhatsApp application to send messages to Hirschy.

**C.    Cohen Generates Numerous Buy Orders in Furtherance of the Scheme**

24.    In August and September 2017, Cohen and his workers in the Philippines call room made numerous telephone calls to potential investors in the United States with the goal of generating orders to buy HD View stock at the prices sought by Hirschy. Cohen targeted investors whose names Individual C and Individual D had provided to him, as well as other investors he had previously convinced to purchase other stocks. Most of the investors Cohen induced to purchase HD View stock were senior citizens.

25.     Cohen personally misled every one of the investors who were induced to place a buy order for HD View stock by the call room.  Cohen's call room workers made initial cold calls to targeted investors using detailed scripts Cohen had provided.  Cohen instructed his workers to transfer all promising leads directly to him so that he could personally deliver a materially false sales pitch, and provide instructions on how to place an order.

26.     Cohen falsely presented himself to prospective investors as having "skin in the game." Cohen told prospective investors that his "service" was free to investors and that he would make money by virtue of warrants that HD View had agreed to issue to him based on his sales.  In fact, Cohen did not hold warrants, but instead was entitled to receive sales commissions based on the buy orders he induced the investors to place.  In this manner, Cohen made false statements of material fact indicating that his interests were in complete alignment with his recommendations, because he would make money only if the price of HD View stock rose above the strike price of his warrants.

27.     Cohen also misled investors about the nature of their purchase of HD View stock. Cohen recommended purchasing HD View stock at specific prices set by Hirschy, even though Cohen knew that those prices were artificially high and not the true value of the stock.  Cohen also misleadingly portrayed HD View stock to investors as a hot new growth stock that was being actively traded in a fair marketplace.

28.     The prices and volumes of the customer orders generated by Cohen closely matched the prices and volumes that Hirschy instructed Cohen to arrange.  Hirschy often posted a sell price that was slightly below the buy order price he had asked Cohen to solicit.

29.     In accordance with his arrangement with Hirschy, Cohen alerted Hirschy to incoming buy orders so that Hirschy could arrange a match sale.  The Matched Trading Scheme generated approximately $1,208,487 in proceeds from sales to unsuspecting investors.  There were over 1,400

trades in HD View stock during the Relevant Period.  Cohen recruited, and was responsible for sales to, a significant number of the investors who made these trades.  By his own calculation, Cohen was entitled to approximately $180,000 - $200,000 in commissions based on the agreement with Hirschy, Individual C, and Individual D pursuant to which he was to receive 15% of the total sales he generated.

30.     Cohen acted with scienter.  He induced investors to place buy orders for HD View stock with knowledge that Mancino or Hirschy, or entities that they controlled, would enter matching offers to sell the stock at substantially the same sizes, times, and prices for the purpose of creating a false or misleading appearance of active trading in HD View stock.  Cohen acted with the specific purpose to serve his own pecuniary interest by receiving commissions from Hirschy based on trading at manipulated prices.

**D.     Cohen Withdraws from the Matched Trading Scheme After Not Receiving Commissions He Believed He Was Owed**

31.     Cohen ultimately terminated his participation in the Matched Trading Scheme because he believed he was not receiving the commissions to which he was entitled under his agreement with Hirschy, Individual C, and Individual D.  Cohen came to believe that Individual C and Individual D retained for themselves most of the $180,000 - $200,000 in sales commissions to which Cohen believed he was entitled.

32.     In or about September 2017, Cohen complained to Hirschy about his belief that Individual C and Individual D were not paying all the sales commissions to which he was entitled.  Cohen threatened to stop sending investors to Hirschy for the Matched Trading Scheme.  Cohen briefly stopped making calls to investors about HD View stock, and threatened never to resume making such calls.

33.     In response, Hirschy asked Cohen to continue making calls to investors about HD View stock.  Hirschy promised to make other arrangements to remit Cohen's share of future proceeds

that would not involve going through Individual C and Individual D. Hirschy told Cohen that, in the future, his share would be routed through one of Mancino's relatives. Thus, in an effort to keep Cohen working for the Matched Trading Scheme, Hirschy arranged for another person – "Individual E" – to begin serving as a conduit to remit sales commissions to Cohen. From September through November 2017, Individual E routed approximately $29,500 in sales commissions to Cohen.

34.     Despite Hirschy's attempts to convince Cohen to continue working with him on the Matched Trading Scheme, Cohen did not send additional matched trades to Hirschy after sometime in November or December 2017. Nonetheless, during the Relevant Period, Cohen received a total of at least approximately $46,500 in sales commissions via Hirschy, Individual C, Individual D, and Individual E through his participation in the Matched Trading Scheme.

**E.     Cohen is Arrested and Admits Role in the Matched Trading Scheme**

35.     Beginning in approximately November 2017, a covert law enforcement operation uncovered the Matched Trading Scheme. The United States Attorney Office for the Eastern District of New York ("USAO") subsequently caused the arrests of both Mancino and Hirschy. *See United States v. Mancino, et al.,* 1:18-cr-00296-KAM (E.D.N.Y. June 13, 2018). Both Mancino and Hirschy eventually pleaded guilty to securities law violations and wire fraud charges arising from the Matched Trading Scheme and a similar scheme to manipulate trading in the stock of another microcap company. In July 2019, Mancino was sentenced to a fifteen-month prison term, fined $5,000, and ordered pay approximately $1.2 million in restitution. Hirschy is still awaiting sentencing.

36.     In March 2018, the Commission filed a parallel enforcement action against Mancino and Hirschy, alleging violations of the anti-fraud provisions of the federal securities laws. *See SEC v. Mancino, et al.,* 18-civ-1316-GRB-JMW (E.D.N.Y. Mar. 2, 2018). Hirschy has admitted liability

in the civil case, and agreed that monetary sanctions against him will be addressed after his sentencing in the criminal case.  The Commission's case against Mancino is pending.

37.    On March 16, 2022, Cohen was arrested in Saipan on a charge of conspiracy to commit securities fraud based on his role in the scheme to manipulate HD View stock trading, and an unrelated money laundering charge.  The USAO thereupon filed a criminal complaint against Cohen. *See U.S. v. Cohen,* 1:22-cr-00209-KAM (E.D.N.Y. May 4, 2022).  Cohen has been in custody in the Metropolitan Detention Center in Brooklyn since his arrest.   On August 1, 2022, Cohen pleaded guilty to the charge that he conspired to commit securities fraud through his participation in the Matched Trading Scheme.  He remains in custody awaiting sentencing.

**F.    Cohen Acted as a Broker Despite Not Being Registered with the Commission**

38.    Cohen has never been registered with the Commission as a broker.  Cohen admitted to an undercover law enforcement officer that he "never had a license [to sell stocks]…I just sell it. Boiler room sort of thing."

39.    Cohen nonetheless acted as a broker in arranging sales of HD View stock.  Cohen participated at key points in the chain of distribution of HD View stock, including actively soliciting purchases from investors in the Eastern District of New York and elsewhere in the United States. Among the activities in which Cohen engaged were (1) soliciting investors to purchase HD View stock and other securities; (2) receiving transaction-based compensation as opposed to salary; (3) making valuations as to the merits of the investment or giving advice; and (4) being an active rather than passive finder of investors.

## **FIRST CLAIM FOR RELIEF**
### **Violation of Sections 9(a)(1) and (2) of the Exchange Act**
### **[15 U.S.C. §§ 78i(a)(1) and (a)(2)]**

40.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 39, inclusive, as if the same were fully set forth herein.

41.     From at least July 2017 through at least November 2017, Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, for the purpose of creating a false or misleading appearance of active trading in HD View securities, or a false or misleading appearance with respect to the market for such security, entered an order or orders for the purchase of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties; or entered an order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties.

42.     Defendant directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, with specific intent, effected, alone or with one or more persons, a series of transactions in HD View securities creating actual or apparent active trading in those securities, or raising the price of that security, for the purpose of inducing the purchase or sale of those securities by others.

43.     By engaging in the foregoing, Defendant, singly or in concert with others, violated, and unless enjoined, is reasonably likely to violate again in the future Sections 9(a)(1) and 9(a)(2) of the Exchange Act [15 U.S.C. §§ 78i(a)(1) and (a)(2)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**
**and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder**

44.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 39, inclusive, as if the same were fully set forth herein.

45.     From at least July 2017 through at least November 2017, Defendant, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly:

          (a)     employed devices, schemes or artifices to defraud; or

          (b)     made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

          (c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

46.     By engaging in the foregoing conduct, Defendant, singly or in concert with others, violated and unless enjoined, is reasonably likely to violate again in the future Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5, [17 C.F.R. § 240.10b-5] thereunder.

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

47.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 39, inclusive, as if the same were fully set forth herein.

48.     From at least July 2017 through at least November 2017, Defendant, directly or indirectly, by use of the means and instruments of transportation or communication in interstate commerce and by the use of the mails, and in connection with the offer or sale of securities:

          (a)     knowingly or recklessly employed devices, schemes, or artifices to defraud;

(b)     knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business that operated as a fraud or deceit.

49.     By engaging in the foregoing conduct, Defendant, singly or in concert, has violated, and unless enjoined, is reasonably likely to violate again in the future Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 15(a)(1) of the Exchange Act**

50.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 39, inclusive, as if the same were fully set forth herein.

51.     From at least July 2017 through at least November 2017, Defendant, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, effected transactions in, or to induced or attempted to induce the purchase or sale of a security without being registered with the Commission in accordance with Section 15(b) of the Exchange Act.

52.     By engaging in the foregoing conduct, Defendants, singly or in concert, violated and unless enjoined, is reasonably likely to violate again in the future Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Finding that the Defendant violated the securities laws and rules promulgated thereunder as alleged against him herein;

**II.**

Permanently restraining and enjoining Defendant, his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice by personal service or otherwise, from future violations of the federal securities laws as alleged herein;

**III.**

Ordering Defendant to disgorge any and all ill-gotten gains he received directly or indirectly, together with prejudgment interest, as a result of the violations alleged in this Complaint; pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7)];

**IV.**

Permanently prohibiting Defendant from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

**V.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Duane K. Thompson*
Duane K. Thompson*
Senior Trial Attorney
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
thompsond@sec.gov
Telephone: (202) 551-7159
*Pro Hac Vice Application Pending*

**Counsel to Plaintiff**
**Securities and Exchange Commission**

Dated:  May 2, 2023